## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 05-CV-1424-RPM-OES

**EXECUTIVE MARKETING HOLDING CORP.**

                                    Plaintiff,

v.

**CONSECO LIFE INSURANCE COMPANY,**

                                    Defendant.

---

### MEMORANDUM OF LAW OF DEFENDANT CONSECO LIFE INSURANCE COMPANY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFF'S EXPERT RONALD SEIGNEUR UNDER FEDERAL RULE OF EVIDENCE 702

---

## I.      INTRODUCTION

EMI's financial expert Ronald Seigneur ("Seigneur") should be excluded from providing any expert opinion testimony in this case on the grounds that his testimony and his expert report do not meet the requisite standards of reliability established under the Federal Rules of Evidence and federal common law.  In particular, Seigneur's report fails to account for the existence of the parties' signed, written contract, improperly attributes to Conseco damages for projected losses resulting from other insurance carriers' commission revenue, is based on erroneous income and expense assumptions, and uses a "lost business value" damages model without justification. Under these circumstances, his testimony cannot pass the legal gatekeeper standards set forth in *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1992) and Federal Rule of Evidence 702.

## II.    RELEVANT BACKGROUND FACTUAL STATEMENT

### A.    1993 EMI Contract with Massachusetts General Life; Alleged Partnership; Subsequent 2004 EMI Contract with Conseco.

Plaintiff EMI is an independent marketing organization located principally in Colorado.[1] Wayne Hudgens ("Hudgens") and Larry Noyes ("Noyes") founded EMI in 1993.  EMI recruits agents to write policies for a number of life insurance companies, including Conseco, on a non-exclusive basis.  The agents then enter contracts directly with the insurance carriers.  Over the years, EMI received compensation from Mass General (and later Conseco) in the form of commissions and a variety of other programs to introduce new products, flat fees for applications, and persistency rewards.  These different types of commissions and bonus payments are set forth in the compensation schedules between Conseco and EMI.  These payments would also include future renewal commissions based upon the Conseco policies remaining in place.[2]

EMI describes its initial 1993 contractual arrangement with LPG as a partnership:

LPG [] offered to pay EMI as an independent marketing organization ("IMO") if EMI would establish an exclusive relationship with LPG arising from the distribution network of Kentucky Central Life. . . .

This relationship was formed in a fashion of a **partnership**, whereby both Massachusetts General Life and EMI would work jointly to establish a

---

[1] Complaint, ¶ 2.
[2] *See* EMI / Mass General's General Agent's Contract, Exh. 4 to June 22, 2007 deposition transcript of Ronald Seigneur ("Seigneur Depo."), Exhibit A hereto, at C003683-3690; Conseco's August 1, 2006 Memorandum in Support of Summary Judgment, at 2-3, June 19, 2007 Final Pretrial Order, at 4.

marketing organization which would in turn generate insurance policies

and the resulting insurance policy premiums. . . .[3]  (emphasis supplied)

On October 6, 1993, EMI entered into a General Agent's Contract with Mass General

which included addenda and compensation schedules entitling EMI to override commissions and

other bonuses based on production generated by the Conseco agents in EMI's hierarchy.[4]

Eleven years later, on August 24, 2004, EMI signed the Conseco Sales Representative

Agreement.  This contract also entitled EMI to commissions and other compensation as an IMO

and contained both an integration provision and a clause permitting either party to terminate

upon 30 days written notice.[5]  Seigneur was unaware of both the 1992 Mass General and the

2004 Conseco contracts with EMI and also unaware that Mass General and Conseco paid EMI

under these contracts.[6]

### B.      Conseco's 2004 Termination of Hudgens and EMI.

Prior to November, 2003, Conseco notified its policyholders of a potential increase in the

policy premiums of its "Non-Guaranteed Element" ("NGE") policies.  Conseco sent a letter to

EMI and its other IMOs in February 2004 advising that the policyholder "leads" on its website or

on CD-ROM, accessible only by IMOs, were protected under the Gramm-Leach-Bliley Act and

were subject to restrictions regarding confidential information contained in the standard Conseco

agreements (which Hudgens and Noyes had counter-signed with EMI's hierarchy agents).[7]

---

[3] Complaint, ¶ 6 (emphasis supplied) Seigneur Depo. (Exhibit A hereto), at 11; EMI's Answers
to Conseco's Second Set of Interrogatories, No. 6 (Exhibit B hereto.).
[4] Exh. 4 to Seigneur Depo. (Exhibit A hereto).
[5] *See* Exh. 5 to Seigneur Depo. (Exhibit A hereto). EMI does not contest the validity of these
provisions.
[6] Seigneur Depo. (Exhibit A hereto) at 21-23.
[7] Final Pretrial Order, at 5.

On May 22, 2004, Hudgens prepared for, and then met with several non-Conseco insurance agents in Honolulu, Hawaii.  These activities would lead ultimately to his and EMI's termination.  Specifically, Hudgens distributed 250 to 300 NGE policyholder leads he had downloaded from the Conseco website and signed some of the agents on as Indianapolis Life agents.  After the meeting, two of the agents (Virgilio Barayuga and Ronald Craig) convinced several Conseco policyholders to exchange their Conseco policies for Indianapolis Life policies.  Conseco ultimately discovered from Barayuga that he had obtained the Conseco policyholder information from Hudgens, initiated an internal investigation, and concluded that Hudgens had violated his 1993 Mass General agent contract.[8]

On December 8, 2004, Hudgens was notified in writing that he had been terminated "for cause."  Conseco investigator Heather Harley called Hudgens that same day.  Hudgens admitted to Harley that he provided Conseco policyholder information to non-Conseco agents, and that one agent had sold Indianapolis Life policies to Conseco policyholders.  (Final Pretrial Order, at 6.)  Due to the "for cause" nature of the termination, EMI forfeited its right to any future renewal commissions under its operative written contract.[9]

### C.    EMI's Commencement of Suit Against Conseco.

On July 28, 2005, EMI commenced this lawsuit.  Presently, it asserts claims for breach of contract, breach of fiduciary duty, promissory estoppel, and unjust enrichment all arising out of the December 2004 termination.[10]  As noted above, the breach of the partnership agreement

---

[8] Final Pretrial Order, at 5-6.
[9] Seigneur Depo. (Exhibit A hereto), at 33-36.  Seigneur was not aware of these facts.
[10] The other claims (bad faith breach of contract, conversion, and civil theft) were later abandoned.  Final Pretrial Order, at 4.

claim is described as an unwritten partnership created by a course of conduct.[11]  EMI has acknowledged, however, that it is *not* seeking damages "for breach of contract based upon any alleged violation of the contract dated October 6, 1993 between [EMI] and Mass[] General . . . ,."[12] and that it is not seeking breach of contract of the 2004 Conseco contract.

**D.      EMI's Unjust Enrichment Damages Claim.**

As an alternative to its breach of contract claim, EMI alleges that Conseco has been unjustly enriched by virtue of "the efforts of EMI to establish a marketing hierarchy."[13]  More specifically, EMI asserts that Conseco misappropriated to its own economic advantage EMI's "national marketing plan" presented to Conseco in May 2004 (even though Conseco declined EMI's proposal).[14]  The EMI "plan" contains the following points:  (1) front office agent contracting services; (2) distribution to agree upon platform and delivery system; (3) recruiting programs; (4) seminars; (5) product launches; (6) meeting support; and (7) sales support.[15]

**E.      Discovery of "EMI Partnership" Facts.**

The following undisputed facts are have been gathered in discovery:  (a) no written partnership agreement exists; (b) EMI is not owed any out-of-pocket expenses or commissions from Conseco from January 1, 1999 to present;[16] (c) there were never any direct profit-sharing payment made between EMI and LPG or  EMI and Conseco; (d) EMI has never filed any U.S.

---

[11] Complaint ¶¶ 10, 37; October 14, 2005 Scheduling Order, at 2; September 5, 2006 EMI Response to Defendant's Motion for Summary Judgment, at 2–5, 7-10.

[12] May 26, 2006 EMI Responses to Conseco's Second Set of Requests for Admissions, no. 3, (Exhibit C hereto).

[13] Complaint, ¶ 47; Seigneur Depo. (Exhibit A hereto), at 18.

[14] The "EMI Commitment" proposal, C 000025 – 31 is attached as Exhibit D hereto.

[15] *Id.*, at C 000030.

[16] *See* EMI's Responses to Defendant's First Set of Interrogatories, No. 13, (Exhibit E hereto); Seigneur Depo. (Exhibit A hereto), at 39-40.

Form 1065 partnership tax returns on behalf of the "partnership;"[17] (e) the "partnership" was not listed on EMI's financial statements.[18]

      **F.    EMI's 2005 and 2006 Damages Claims.**

In October 2005, EMI asserted that it was seeking damages equivalent to 10 years' worth of its "the reasonable and equitable value of commission[s] to which it is entitled based upon the revenue in the form of 10 years' worth of average commissions it received from Conseco for the years 2000-2004, inclusive, in the approximate amount of $3,914,166."[19]  This analysis sought recovery of an average stream of commissions into the future, notwithstanding EMI's acknowledgement that it was *not* asserting any claims for breach of the 2004 Conseco contract.

Apparently recognizing that its damages were not sustainable – since it was not seeking breach of the contract under which it was receiving commissions – on June 29, 2006, Mr. Seigneur issued a report adopting a "lost business value" model, concluding that EMI had incurred a total economic loss of $3,013,000, based on:

> . . . the difference between the value of EMI before and after the wrongful termination of the IMO relationship. This is based on an analysis of the commissions which EMI was entitled to, based on historical data, as compared to the loss of this same revenue [capitalized and then discounted to present value].[20]

---

[17] EMI's Responses to Conseco's Second Request for Admissions, No. 9, (Exhibit C hereto).

[18] Final Pretrial Order, at 6-7; Conseco's August 1, 2006 Memorandum in Support of Summary Judgment, at 19-20.

[19] October 24, 2005 Scheduling Order, at 7.

[20] June 19, 2007 Final Pretrial Order, at 4; June 29, 2006 Report of Seigneur Gustafson Knight LLP ("Seigneur Report"), Exhibit 1 to Seigneur Depo. (Exhibit A hereto).  EMI has never explained why it did not sue under the 2004 Conseco Sales Representative Contract.  It has thus conceded that Conseco's termination of EMI was in accord with the contractual provisions.

Although EMI's description of its damages in the Final Pretrial Order refers only to commissions *it* "was entitled to," the 2006 model is undisputedly based on an analysis of *all commission revenue EMI received from all insurance carriers.* [21]

EMI provided Seigneur with its profit and loss statements for 1997-2004, income tax returns, the Complaint, and Conseco's answers to three written discovery requests.[22] He also relied on representations from management (Mr. Noyes and Mr. Hudgens) and industry-specific market data.[23] The relevant historical data and the two projected financial scenarios (assuming no Conseco termination and assuming termination) contained in Seigneur's report are the following[24]:

| Year | Total EMI Commission Revenue | Conseco-Specific Revenue | EMI Net Income |
|---|---|---|---|
| 2000 (Actual) | $1,089 million | $349,000 | ($136,000) |
| 2001 (Actual) | $1,105 million | $327,000 | $79,000 |
| **2002 (Actual)** | **$1,527 million** | **$522,000** | **$252,000** |
| 2003 (Actual) | $1,120 million | $464,000 | ($217,000) |
| **2004 (Actual)** | **$1,228 million** | **$296,000** | **$12,000** |
| 2005 (Projected, assuming no termination) | $1,833 million | | |
| 2005 (Projected, assuming termination | $636,000 | | |
| Difference in first year of future projections (2005) in total revenue assuming no termination and assuming termination:  $1,197,000 ($1,833,000 less $636,000). | | | |

---

[21] Seigneur Depo. (Exhibit A hereto), at 72.

[22] Seigneur Report, Exhibit 1 to Seigneur Depo. (Exhibit A hereto), at 2.

[23] *Id.*, at 2-3 and Exhibits A-E thereto.

[24] 2000-2004 profit and loss statements, Exhibits 7-11 to Seigneur Depo. (Exhibit A hereto); Exhibits B and C to Seigneur Report, Exhibit 1 to Seigneur Depo. (Exhibit A hereto).

Based upon this data and his meetings with EMI, Seigneur made the following assumptions and conclusions:

(a)      EMI's future economic damages directly resulted from Conseco's termination of its "contract" with EMI;

(b)      The "discounted cash flow" method relies upon projected "historical commission stream received from <u>all of EMI's clients</u>…" (emphasis added) in both the "but for" and "after" Conseco's termination of its contract with EMI;

(c)      EMI's projected commission revenue in the "but for" scenario utilizes EMI's commission revenue in <u>2002</u> as the most representative year from which to project future growth;

(d)      beginning in 2005 (the first "but for" year after Conseco's termination of EMI), EMI would have achieved a <u>20%</u> annual growth rate in total commission revenue for the first and second years had the EMI-Conseco "contract" continued, decreasing thereafter to 3% by 2014;

(e)      The year 2005 was chosen as the most representative year for calculating EMI's projected revenues as a result of the Conseco termination (the "after termination" scenario);

(f)      EMI would generate a 15% operating margin beginning in 2005, increasing to 22% in 2006; and

(g)      EMI would both re-invest its profits back into its business and distribute cash to its owners.[25]

In short, Mr. Seigneur's projected "but for" economic loss calculation of $3.013 million is based on results from a single year (2002) and projected first-year commission revenue in 2005 of $1.8

---

[25] Seigneur Report, Exhibit 1 to Seigneur Depo. (Exhibit A hereto), at June 29, 2006 cover letter, p. 4, 8, 9, and Exhibits B and C thereto.

million and an operating margin of 15% for the ten-year period from 2005 to 2014, as compared

to the lowest revenue year (2004) for the "after termination" projections that begin in 2005 with

a 50% reduction from actual 2004 revenue.

### III.    RELEVANT LEGAL STANDARD

**A.    Seigneur's Report Must Satisfy the Reliability and Relevance Requirements of Rule 702 and *Daubert* in Order to Be Admissible at Trial.**

Federal Rule of Evidence 702 provides, "[i]f scientific, technical, or other

specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

training, or education, may testify thereto in the form of an opinion or otherwise."  Under

Rule 702 and the rules set forth in *Daubert*, "expert witness is admissible under Rule 702,

if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the

jury or other trier of fact to understand or resolve a fact at issue." *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-593, 113 S. Ct. 2786, 125 L.Ed.2d 469

(1993); *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S. Ct. 1167, 143

L.Ed.2d 238 (1999)(noting that the analysis applies to technical as well as to scientific

testimony); *People v. Shreck*, 22 P.3d 68, 73 (Colo. 2001)(declining to follow either

*Daubert* or *Frye v. U.S.*, 54 App.D.C. 46, 47(DC. Cir 1923)*,* in favor of CRE 702 and

CRE 403 which focus on relevance and reliability).

"It is axiomatic that an expert, no matter how good his credentials, is not

permitted to speculate." *Goebel v. Denver & Rio Grande Western R.R. Co.,* 215 F.3d

1083, 1088 (10th Cir. 2000).  To be admissible, a qualified expert witness' testimony

must be "based upon sufficient facts or data," "the product of reliable principles and

methods," and the expert must apply these principles and methods "reliably to the facts of

the case." Fed.R.Evid. 702.  Admissible expert testimony must be grounded in "the

methods and procedures of science rather than subjective belief or unsupported

speculation." *Hollander v. Sandoz Pharmaceuticals Corp.,* 289 F.3d 1193, 1205 (10th

Cir.2002).

Generally, the district court should focus on an expert's methodology rather than

the conclusions it generates. *Daubert,* 509 U.S. at 595, 113 S. Ct. 2786.  However, an

expert's conclusions are not immune from scrutiny: "A court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered." *Goebel v.

Denver and Rio Grande Western R. Co.,* 346 F.3d 987, 992 (10th Cir. 2003).  Said another

way, "conclusions and methodologies are not entirely distinct," given that "[t]rained

experts commonly extrapolate from existing data" and "nothing in <u>Daubert</u> or the Federal

Rules of Evidence requires a district court to admit opinion evidence that is connected to

existing data only the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136,

146 (1997).

Further, the information relied upon by the expert must be viewed as reliable by

some independent, objective standard beyond the opinion of the individual witness.  *TK-7

Corp. v. Estate of Barbouti*, 993 F.2d 722, 733 (10th Cir. 1993).  Thus an expert must do

more than blindly accept the information received from or prepared by an interested party

in the case.  *See id.* (granting directed verdict where the expert relied on market study

prepared in part by one of the parties as the basis for his damage calculations); *see also

Chemipal Ltd. v. Slim-Fast Nutritional Foods Intern., Inc.*, 350 F.Supp.2d 582, 591 (D.

Del. 2004)(precluding expert testimony where expert relied on material in a report

prepared by the plaintiff's advertising agency without verifying the information.).

Similarly, the expert cannot simply ignore facts that are inconsistent with the expert's theory. *See Estate of Barbouti*, 993 F.2d at 733 (noting that the expert's projections of lost profits were inconsistent with the plaintiff's history of domestic losses).

> **B.    The Court Must Act As A Gatekeeper To Prevent Irrelevant And Unreliable Testimony From Being Presented To The Jury.**

Under the plain terms of Rule 702, all expert witnesses must be "qualified," must base their testimony on "knowledge," and must offer testimony that "will assist the trier of fact." Fed. R. Evid. 702. In *Daubert*, the Supreme Court shed further light on the language of Rule 702, explaining that a trial judge's "gatekeeping responsibility" under the rule includes ensuring that "any and all" scientific testimony or evidence is "not only relevant, but reliable." *Daubert* 509 U.S. at 589; *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005). The trial court has a duty to ensure that an expert is properly qualified and that expert testimony is both reliable and relevant and has great latitude in making that decision. *See Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1119 (10th Cir. 2004). The Court's gatekeeping role, as recognized in *Daubert* and subsequent opinions by the Tenth Circuit Court of Appeals, is vitally important, as it serves to check the jury's inclination to give great (and sometime inordinate) weight to the testimony of expert witnesses.

The Supreme Court later acknowledged the difficulty of the gatekeeper role when it stated,"[n]either the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules impose…" *General Elec. Co.,* 522 U.S. at 148 (Breyer, J., concurring.). By ensuring that all expert testimony presented in a courtroom is based on reliable methodology, judges reduce the likelihood that verdicts will be based on passion and prejudice and thus

help to ensure fair and just outcomes of litigation.  The difficulty that jurors have in evaluating technical evidence, combined with their natural tendency to defer to experts, makes the gatekeeper role of the trial judge in screening expert evidence all the more important.

## C.     The Appropriate Measure of Damages in a Breach of Contract Action is Lost Profits.

In a breach of contract action, the objective is to place the injured party in the position it would have been in but for the breach.  *See Carder, Inc. v. Cash*, 97 P.3d 174, 185 (Colo. App. 2003); *McDonald's Corp. v. Brentwood Ctr., Ltd.,* 942 P.2d 1308 (Colo. App.1997).  The prevailing party is therefore entitled to recover the amount of damages necessary to accomplish that objective.  *Id.*  The amount of damages cannot be based on speculation or conjecture; however, damages need only be determined with reasonable certainty.  *Id.*  When recovery of lost net earnings is sought, the plaintiff need only provide a reasonable basis for computation, using the best evidence obtainable under the circumstances that will enable the trier of fact to arrive at a fairly approximate estimate of the loss. Evidence of past performance may form the basis for a reasonable prediction of future profits.  *Airborne, Inc. v. Denver Air Ctr., Inc.,* 832 P.2d 1086 (Colo. Ct. App.1992).

A party seeking to recover damages for lost profits must prove three things. First, the party must prove that the lost profits were reasonably foreseeable to all parties to the contract at the time they entered into the contract. *See Carder, Inc. v. Cash*, 97 P.3d at 185 (Colo. Ct. App. 2003)*(citing Colo. Nat'l Bank, supra,* 846 P.2 d 159, 174  (Co. 1993).  Second, the party must demonstrate that the damages sought "are traceable to and are the direct result of" the breaching party's conduct. *Graphic Directions, Inc. v. Bush,* 862 P.2d 1020, 1025 (Colo.App.1993).  Third, the party must prove that there is a reasonable basis for computing such damages. *Graphic*

*Directions, Inc., supra,* 862 P.2d at 1024; *see also Pomeranz v. McDonald's Corp.,* 843 P.2d

1378 (Colo.1993); *Tull v. Gundersons, Inc.,* 709 P.2d 940, 943-45 (Colo.1985).

## IV.   <u>LEGAL ARGUMENT</u>

    **A.**    **Seigneur cannot merely assume the existence of a contract for damage calculation purposes, where EMI's is claiming breach of a partnership agreement and (a) he provides no opinion on whether EMI had an accounting partnership on which to base his calculations and (b) he has no familiarity with the 1993 Mass General or the 2004 Conseco contracts under which EMI was paid commissions and other compensation.**

Although Seigneur is a certified public accountant who is familiar with the Internal

Revenue Code and was aware from reading the Complaint that EMI was asserting a claim for

breach of a partnership agreement between EMI and Mass General (and later Conseco), he has

offered no opinion in his report as to whether such a partnership existed.[26]  In fact, he could not

identify what "contract" he referred to in his report as the basis for his damages analysis nor did

he know if there were any written contracts between EMI and Mass General and EMI and

Conseco.[27]  Plainly, EMI did not provide him with the terms of the contract including the manner

in which was to be compensated.  Accordingly, he did not factor into his analysis the fact that the

2004 written contract contained a 30-day mutual termination provision, set forth a detailed

mechanism setting forth the manner by which EMI was to be paid, and barred any other prior

agreements between the parties.  He admits, however, his calculations are based solely on the

future years after termination (2005) and that EMI is paid some consideration of every premium

dollar by its agents.[28]

Instead, Seigneur utilizes a "lost business value" damages model.  In order for his report

to contain the requisite reliability, his calculation must have a basis for assuming the type of

---

[26] Seigneur Depo. (Exhibit A hereto), at 13-14.
[27] *Id.* at 11, 20-21, 9.
[28] *Id.* at 38-40.

contract in place (given the existence of the signed contract), but Seigneur cannot identify such a

contract.  Simply stated, his ultimate conclusions cannot be reliable if they are not based on

verifiable and valid assumptions, and he credibly make projections based on future commissions

paid under the 1993 and 2004 Mass General and Conseco written contracts on the one hand and

on the other hand take no position on whether the [partnership] "contract" that EMI relies upon

exists.

Practically speaking, Mr. Seigneur's silence on the partnership issues speaks volumes.[29]

Since EMI has conceded that there was no agreement to share profits and expenses, there was no

such partnership.  Therefore, absent an explanation as to the rationale underlying the assumption

that EMI and Conseco had a separate contractual arrangement in place that required Conseco to

pay commissions to EMI in addition to their signed 2004 written contract, his report cannot meet

the *Daubert* test.  *See General Elec. Co.,* 522 U.S. at 148.  In fact, Mr. Seigneur's understanding

of how EMI was to be paid under the "IMO contract" – that "EMI would earn revenues from

agents that they would recruit selling Conseco… products,"[30] is the exact compensation scheme

established in the 1993 Mass General and 2004 Conseco written contracts, neither one of which

is part of EMI's lawsuit.

---

[29] Note that EMI's expert Robert Levis cited to the Internal Revenue Code and concluded that no partnership existed between EMI and Mass General or EMI and Conseco.  August 9, 2006 Report of Robert Levis ("Levis Report") (attached as Exhibit F hereto), at 8-9 and attached IRS Publication 541, at 2

[30] Seigneur Depo. (Exhibit A hereto), at 10-11.

**B.    Seigneur's testimony should also be stricken because he has not demonstrated any connection between his inclusion of commission income from all other insurers and Conseco's termination of EMI in 2004.**

EMI is a non-exclusive IMO.  As such, it works with a number of other insurance carriers.[31]  Conseco had no contract with any of these other insurers.  EMI was likewise free to engage its agents with other insurers.  Here, Seigneur calculated his projected future commission revenues for EMI based upon "all of EMI's clients,"[32] not just Conseco commissions, but has never stated any reason that the loss of revenue from any non-Conseco carrier is directly related to Conseco's termination of EMI.  Indeed, Seigneur has admitted that there is no connection between any decision by EMI's largest single insurer client, Great American Life, to stop writing business (as did eventually happen) and Conseco's termination of EMI.[33]  Further, he has admitted that Principal Life's drop in commissions from $206,000 in 2004 to $42,000 from January 2005 to July 2006 has no connection to the termination either.[34]  This analytical failure constitutes reason to exclude his report because under *Daubert,* "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."  See *Dodge v. Cotter Corp.* 328 F.3d 1212, 1222 (10th Cir. 2003).

Seigneur's report offers a one-line rationale for attributing future losses (as well as increases had the contract remained in place) to other insurers by asserting that EMI has continued "to re-build their new limited base of brokers and products."[35]  However, this self-

---

[31] See 1997-2004 EMI profit and loss statements (copies attached as Exhibits 6-14 to Seigneur Depo. (Exhibit A hereto); Seigneur Depo. at 72.

[32] Seigneur Report, Exhibit 1 to Seigneur Depo. (Exhibit A hereto), at 8 ("[w]e began our analysis by reviewing the historical commission stream received from all of EMI's clients and in particular the commissions received from Conseco.")

[33] Seigneur Depo. (Exhibit A hereto), at 74.

[34] *Id.* at 80; Exhibits 11-13 to Seigneur Depo.

[35] Seigneur Report, Exhibit 1 to Seigneur Depo. (Exhibit A hereto), at 4.

serving explanation is not supported by any credible facts, since he admitted he did not know how many agents EMI had in its hierarchy between 2000 and 2004, how many agents EMI added, or how many it allegedly lost because of Conseco's termination.[36]  His testimony is equally uncompelling: "[b]ecause it made sense to me to do it that way."  [Id.]  As previously noted, "nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only the *ipse dixit* of the expert."  *See General Elec. Co.*, 522 at 146 (1997).  Further, his inclusion of all commission income is contradicted by EMI's own statement of its damages in the Final Pretrial Order, which describes the basis of his calculations as "the commissions which EMI was entitled to, based on historical data, as compared to the loss of this same revenue."[37] (emphasis supplied)  Clearly, EMI is not "entitled to" receive commission from any other insurer by reason of Conseco's termination, nor had it made such a claim in its Complaint or in its initial damages disclosures.

Seigneur's inclusion of all insurer commissions violates the principle that a party should not be put into a better position then it would have been if the contract had remained in place.  At a minimum, Seigneur should have instead proportionally allocated the Conseco-specific income on a year-year basis.  By not doing so, Seigneur hides the fact that EMI's commission revenue from Conseco dramatically decreased from $522,000 in 2002 to $269,000 in 2004.  *See Estate of Barbouti*, 993 F.2d at 733 (noting that the expert's projections of lost profits were inconsistent with the plaintiff's history of domestic losses).  As a result, Seigneur's report and testimony should be excluded as unreliable. Fed. R. Evid. 401, 402, 403, 702.

---

[36] Seigneur Depo. (Exhibit A hereto), at 53-54; 77.
[37] Final Pretrial Order, at 4.

**C.**    **EMI's actual historical financial data are wholly inconsistent with Seigneur's assumptions regarding:  (a) 2002 as his base revenue year for revenue purposes; (b) an initial 20% growth rate from 2005 onward; (c) a 15% future profit margin; and (d) exclusion of EMI's actual financial results for 2004.**

In spite of having eight years of financial data to work with (1997-2004), Mr. Seigneur chose "[t]o arrive at a projected revenue stream for EMI, we started with commissions received in 2002."[38]  His deposition testimony did not shed any further light on his choice, referring only to his discussions with the EMI principals.[39]  This choice plainly lacks any reliable explanation other than it represents the highest revenue year from 1997-2004.  For a number of reasons, Seigneur's selection of the year 2002 unduly biases his subsequent analysis.

First, while Conseco worked with EMI until the end of 2004, Seigneur could not explain why he did not use that particular year:  "Didn't utilize it.  That all I can tell you."[40]  As noted above, Conseco's commission revenue paid to EMI had dropped nearly in half from a high of $522,000 in 2002 to $296,000 in 2004.  Yet, just like his failure to provide any proximate cause for including all commission revenue in his calculations, Seigneur likewise offers no explanation for ignoring EMI's reduced Conseco commissions in 2003 and 2004.  Correspondingly, EMI's total commission revenue decreased from $1.527 million in 2002 to $1.228 million in 2002.[41]  In effect, Seigneur cherry-picked the highest revenue year and ignored any negative financial results in the years before and afterwards.[42]  The upshot of his decision was to unrealistically and exponentially increase the future damages numbers.

---

[38] Seigneur Report, Exhibit 1 to Seigneur Depo. (Exhibit A hereto), at 8; Seigneur Depo. (Exhibit A hereto), at 56-57.  As discussed *infra*, he chooses the lowest revenue year (2004) as his "base year" for projecting revenue without Conseco commissions.
[39] Seigneur Depo. (Exhibit A hereto), at 57.
[40] *Id*. at 88.
[41] Compare 2002 and 2004 profit and loss standards, Exhibits 9 and 11 to Seigneur Depo. (Exhibit A hereto).
[42] Seigneur Depo. (Exhibit A hereto), at 57.  He also did not allocate any expenses to the Conseco revenue in his analysis.

Significantly, Conseco's annual life insurance premium for all of its IMOs *decreased* by ten-fold from 2000 ($58 million) to 2004 ($5.6 million), which may explain EMI's drop in Conseco commission revenue and overall commission and further undercut the lack of proximate connection between the use of 2002 as a "base year" and EMI's future projected commissions as of 2005.[43]  While Seigneur read the Robert Levis rebuttal report and agreed with the data and the fact that Conseco was generating considerably less premiums in 2004 than it was in 2000, he did not conduct any meaningful review of Conseco's life insurance business operations.[44] Use of 2002 as a "base" year is also inappropriate because a large percentage of EMI's overall commission revenue for that year originated from a single insurer (Great American).[45]  For that year, Great American comprised 45% ($725,000 out of $1.527 million) of EMI's sales.[46]  By 2004, however, Great American's commission payments to EMI dropped to $294,000, a decrease of 59 percent.  In spite of this actual data, Seigneur ignored the 2004 results entirely and impermissibly based his future calculations on a year where a single insurer represented nearly one-half of the company's revenue.  Though Mr. Hudgens testified that Great American stopped writing business in his March 2006, EMI did not tell Seigneur.[47]   And, he did not even know why Conseco's revenue dropped from 2002 to 2004.[48]  However, he used 2005 (not 2002) as his "base year" for calculating the actual revenues for EMI "after termination" after reducing by 50% EMI's actual 2004 revenue, resulting in a starting revenue of  $635,741 as compared to a projected revenue base of $1,832,684 for "but for" revenue for 2005.

---

[43] Levis Report, Exhibit F hereto, at 4.

[44] Seigneur Depo. (Exhibit A hereto), at 23-24; 26; 30-32.  EMI's agents primarily sold life insurance products.  Id. at 9-10.

[45] 2002 profit and loss statement, Exhibit 9 to Seigneur Depo. (Exhibit A hereto).

[46] Seigneur Depo. (Exhibit A hereto), at 57-58.

[47] Id.. at 58; March 16, 2006 Deposition Transcript of Thomas Wayne Hudgens, attached as Exhibit G, at 219-221.

[48] Seigneur Depo. (Exhibit A hereto), at 90.

Further, his choice of 2002 as a base year correlates with an unsupportable application of a "net profit percentage" (essentially, the company's profit margin) of 15% for the years beyond 2004.[49]  As EMI's own financial results show, the IMO business varies significantly year-to-year based on a number of factors: insurers deciding not to write business, the volume of product placed with the agents, the overall economy, and the quality of an IMO's agents, some of which are beyond EMI's control.[50]  In fact, EMI's average profit margin for 2001-2004 is *1%*.[51]  In spite of this reality, Seigneur conveniently disregarded any year in which EMI had negative net income (2000 - $135,858; and 2003 - $217,358).[52]

Any assumption that EMI was poised to employ its best efforts at growing the Conseco business beyond December 2004 (and thus incurred economic losses due to the termination) is further undercut by EMI's claim in an arbitration proceeding it filed against Principal Life.  In that case, EMI sought to recover 40% of its Denver office expenses incurred between July and December 2003 and 80% of its entire year's Denver expenses for the year 2004.[53]  Similarly, given EMI's loss of the majority of its pre-2005 commission revenue, Seigneur could not identify any specific carriers whose commission revenue would comprise his 2005 projection of $1.832 million.[54]  In truth, EMI's focus on the Principal relationship during 2003 and 2004

---

[49] Seigneur Report, Exhibit 1 to Seigneur Depo. (Exhibit A hereto), at 9.  Dividing net income of $251,616 by total income of $1,527,237 equals 15% from the 2002 profit and loss statement. See Exhibit 9 to Seigneur Report.
[50] Seigneur Depo. (Exhibit A hereto), at 46-50.
[51] Levis Report, Exhibit F hereto, at Exhibit 3 thereto.
[52] See Seigneur Depo. (Exhibit A hereto), at 54, 60-61, 65; 2000 profit and loss statement, at p. 6, 2003 profit and loss statement, at 6, and 2004 profit and loss statement, at 5 (Exhibits 7, 10, and 11 to Seigneur Depo.); Exhibit E to Seigneur's Report (Exhibit 1 to Seigneur Depo.) identified as "2000 – 2005 internally prepared financials statements," omits the 2000 results (when EMI lost $136,000).
[53] September 15, 2006 EMI Answers to Interrogatories, *Executive Marketing Holding Corp. v. Principal Life Ins. Co.,* at No. 9, (Exhibit H hereto).
[54] Seigneur Depo. (Exhibit A hereto), at 84-85.

(which was never provided to Seigneur)[55] strongly suggest that EMI had already re-directed its focus away from Conseco and towards Principal.  It also explains why EMI did not utilize 2003 or 2004 as its "representative" year for damages purposes.

Seigneur also utilizes a 20% annual growth rate for 2005-06,[56] though he could not point to any specific source for this figure, particularly in light of the fact that EMI had lost money every other year from 2000 to 2004 and its Conseco (and overall) commission revenue were decreasing in 2002 and 2004.  His deposition testimony on this point explains his sources: analysis:

Q:      How did you arrive at that 20% rate for the years 2005, 2006?

A:      Discussions with EMI principals, review of all of the underlying documents, consideration of the factual background, and any experience in working with matters of this type.

* * * *

Q:      Between the years 2002 and 2004, were there any years where the total commissions that EMI received were 20 percent greater than the prior year?

A:      No.

Q:      In fact, if you look at the year 2002 and compared to 2003 …  the commissions dropped from 1,527,000 to 1,120,000 –

A:      That's correct.

Q:      Correct?  So that would be a negative growth rate?

A:      Yes.[57]

---

[55] *Id.* at 67-68.
[56] See Exhibit B to Seigneur Report (Exhibit 1 to Seigneur Depo., Exhibit A hereto); Seigneur Depo. (Exhibit A hereto), at 69-70.  The rate decreased significantly to 18%, then to 3% by 2014.
[57] Seigneur Depo. (Exhibit A hereto) at 69-70.

In short, there is no historical, practical, or theoretical basis to assign a 20% growth rate, which is completely inconsistent with the decreasing growth rate of Conseco commission from $522,000 in 2004 to $464,000 in 2003 to $296,000 in 2002.[58]  Seigneur's report merely ignores 2003 and 2004 overall results and the 30% drop in Conseco revenue.[59] For these reasons, his opinion is properly excluded.  *See Estate of Barbouti*, 993 F.2d 722, 733.

> **D.**  **Seigneur incorrectly utilizes a "lost business value" method instead of lost profits.**

Although EMI seeks damages for breach of contract, Mr. Seigneur nonetheless employs a "lost business value" analysis as if EMI were either sold, valued, or went out of business.  *See Protectors Ins. Service, Inc. v. U.S. Fidelity & Guar. Co.*, 132 F.3d 612, 617 (10th Cir 1998)(noting that lost business value is used to determine damages when a business is forced to sell based on the wrongful actions of another.)  His explanation for not choosing the standard method of lost profits is the following:

Q:     Why did you utilize as a methodology here on assessment based upon the value of EMI into the future as opposed to choosing a lost profits method?

A:     I thought it was the best way to lay it out in terms of what I thought was a reasonable approach…

Q:     My question is, why did you choose this method as opposed to a lost profits analysis?

A:     Because I thought this was the appropriate method.[60]

Moreover, the 2004 Conseco contract provides that "[e]ither party may terminate this Agreement by giving written notice to the other party at least thirty (30) days prior to such

---

[58] *Id.* at 90.
[59] *Id.* at 91.
[60] *Id.* at 96-97.

termination date."[61]  Seigneur was not aware of such a provision,[62] therefore rendering unreliable

his assumption of an indefinite expected income stream.  Legally and practically, EMI has not

shown any proof that it would require and indefinite period of time (as is assumed in his report)s

to put itself in the same position it was in had the Conseco "contract" remained in tact and

instead seeks a financial windfall.  Once again, EMI's decision not to provide Seigneur with a

written contract between the parties irreparably undermines the reliability of his report.  *See*

*Boyd v. Kmart Corp.*, 1997 WL 158183, *4 (10th Cir. 1997) (attached hereto as Exhibit I)(in

ruling on an outputs contract, the court noted that if Kmart's obligation would have expired upon

the sale of its automotive service operation, precluding its liability beyond that time to avoid a

damage award improperly exceeding compensable loss); *Sun Insurance Marketing Network v*

*AIG life Insurance Co.*, 254 F. Supp.2d 1239 (M.D. Fla. 2003)(limiting damages to profits lost

during notice period when a party has the right to terminate a contract with notice because future

events are uncertain); *All Line, Inc. v. Rabar Corp.*, 919 F.2d 475, 477 (7th Cir. 1990)(rejecting

plaintiff's demands for lost profits beyond the termination date of the parties' distributor

contract.)

    EMI's own financial data shows that IMOs must take on the business risks such as the

likelihood that an insurer will offer fewer products, stop writing business, or that the relationship

will terminate.  A simple comparison of EMI's profit and loss statement proves this point, one

that Seigneur made no allowance for in his report.  In 2002, Great American ($725,000 in

commission revenue) accounted for 45% of all EMI revenue.  Two years later, that revenue had

decreased by $430,000 to $294,000.  Principal Life, on the other hand, increased from $7,500 in

---

[61] 2004 Contract, Exhibit 5 to Seigneur Depo. (Exhibit A hereto), at C 003726.
[62] Seigneur Depo. (Exhibit A hereto), at 26, 83.

commission revenue in 2003 to $206,000 in 2004, but virtually disappeared by 2006.[63]   Between

Great American Life and Principal, then, approximately one-half of EMI's commission revenue

for the years 2002-2004 vanished by 2005/2006.   In spite of this reality, the Seigneur report

makes no connection (as there is none) to the Conseco termination of EMI and impermissibly

adopts a scenario whereby the EMI-Conseco "contract" continues indefinitely.

> **E.**     **Seigneur has made no connection between EMI's claims of promissory**
>            **estoppel and unjust enrichment and any of his damages calculations.**

Under its promissory estoppel claims, EMI alleges that it "elicited to forego opportunities

to establish independent marketing alliances with other insurance organizations" based on

"representations and promises made to it by Conseco."[64]   While Seigneur examined that issue, he

did not quantify any such damages based on this claim in his report.[65]

EMI also seeks recovery under unjust enrichment[66] for Conseco's "reaping the benefits of

the efforts of EMI" including the benefits Conseco obtained by virtue of EMI's 2004 national

marketing plan.[67]   Seigneur did not qualify any such alleged past or future damages in his

report.[68]   Given that he was not asked to calculate any damages for either "foregone

opportunities" or "the benefits of [] the efforts of EMI" and he did not address such facts or

claims in his report, he should not be permitted to testify at trial on any such damages.

---

[63] See 2002, 2004, 2005, 2006 profit and loss statements, Exhibits 9-13 to Seigneur Report, Exhibit 1 to Seigneur Depo. (Exhibit A hereto).
[64] Complaint, ¶¶ 43-44.  Note that the promissory estoppel and unjust enrichment claims are inconsistent with EMI's breach of contract claim.  See *Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n.,* 649 P.2d 1093, 1096-97 (Colo. 1982).
[65] Seigneur Depo. (Exhibit A hereto), at 15-17.
[66] Complaint, at ¶¶ 47-48.
[67] Plaintiff's September 5, 2006 Response to Summary Judgment, at 15.
[68] Seigneur Depo. (Exhibit A hereto), at 18-19.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, defendant Conseco Life Insurance Company requests that

the Court exclude Ronald Seigneur as an expert witness on behalf of Plaintiff Executive

Marketing Holding Corp. in this case.

Respectfully submitted,


Dated: _____      **HALLELAND LEWIS NILAN**
                                                  **& JOHNSON, P.A.**


By _____
   William D. Hittler (#153916)
   600 U.S. Bank Plaza South
   220 South Sixth Street
   Minneapolis, MN 55402-4501
   612.338.1838
   612.338.7858 (Fax)
   whittler@halleland.com

and

**JONES & WATERS, LLC**
Michael R. Waters
128 South Tejon Street
Suite 404
Colorado Springs, CO 80903
719-633-6303
719-577-4887 (Fax)

ATTORNEYS FOR DEFENDANT CONSECO LIFE
INSURANCE COMPANY

DN: 326066

24